Good afternoon, everyone. We will take the cases up in the order in which they appear on the docket, and after argument in Rodriguez-Diaz v. Barr, which should be Garland, we will take a five-minute recess and then return to do comment irrigation district versus the Bureau of Reclamation. So Mitchell v. Corcoran, counsel, you may proceed. Thank you, Your Honor. Good afternoon. Stephen Luebreiner on behalf of Appellant for the rebuttal. Okay, watch your clock. I will. Yes, thank you, Your Honor. I'll be speaking principally this morning on the Feretta Claim, which in this context arises principally under 2254 D-2, a state court decision based on an unreasonable determination of the facts in light of the evidence in the state court record. And that's an important distinction because it, I think, effectively eliminates much of the precedent, if not all of the precedent, that the state relies on. The Moore case, which tries to read the references to timing in Feretta into a holding, arose under D-1. The Marshall case followed Moore on D-1. Stenson followed Moore on D-1. Now, Marshall did also alternatively deny relief under 2254 D-2. But like most cases involving a factual case-specific determination, it's distinguishable and it can't dictate the outcome in this case. Now, the question of whether there was an objectively reasonable determination of the facts in light of the evidence in the record, I submit it has to be grounded in common sense and day-to-day familiar reality, including the norms of human behavior. And one norm of human behavior in this context, the norm of behavior of typical criminal defendants, is that the decision for self-representation is often not made at the outset of the case. Criminal defendants do not go into court like you go into a restaurant and you get a menu and someone might order the special filet mignon. This may be, but this request was made at the eve of trial and the trial judge, once he did initially grant it, but once he learned that later that the defendant needed four additional weeks to prepare, the trial judge felt that that was unreasonable given the amount of preparation that had already been put into the case, the jury selection, some of the elderly witnesses, and so why was that, why was it objectively unreasonable for the California Court of Appeals to conclude this wasn't a FERETA violation? Well, even the Wyndham case on which the Court of Appeal relied heavily and the government relies heavily in some of the cases of this court site, even the Wyndham case in the California Supreme Court said when the lateness of the request and even the necessity of a continuance can be reasonably justified, the request should be granted. Now, in cases like this, it really is compelling, as I say, to suggest what was Mr. Mitchell supposed to do. Now, I think he proceeded on the chronology that we have as expeditiously as was humanly possible, and that's one thing that distinguishes this case from the Marshall case where the court noted there wasn't a heck of a lot of discussion about the facts and the triggering considerations in Marshall, but the court noted he had six times in which to assert his dissatisfaction with counsel, and he didn't avail himself of those opportunities, and so on the eve of trial, it wasn't unreasonable to say that the request was too late. Now, in this case, we have a very about the case. We know that on January 10th, Mr. Mitchell was given comfort by his current counsel, Mr. Hanlon, yes, we're going to go forward on Mr. Mitchell's chosen defense of absolute innocence, and we're not going to be pursuing the hate of passion manslaughter case. And so, again, the question, what else was Mr. Mitchell supposed to do? Was he supposed to prophylactically discharge counsel out of some deeply held suspicion that counsel was going to betray him and change his mind eventually and proceed on his own when that's clearly the disfavored self-representation is clearly the disfavored alternative on the menu? And I think it's unreasonable to say that he should have gone, okay, the next day, January 11th, maybe I should ask to represent myself. Or January 18th, maybe I should ask to represent myself. From what we know on the state court record, things started to fall apart. He had strong suspicions that things were falling apart. In May, on May 10th, he said, I'd like the public defender. And he didn't get the public defender. And so it's reasonable to assume he made his Faretto request then and said, oh, I need four more weeks to prepare. The trial court would have said the same thing. It said, when he made the Faretto request, I understand your concerns, Mr. Mitchell. Four weeks makes a lot of sense, but it's too late. So I don't know that we know that. I mean, that seems speculative. I mean, here, Mr. Mitchell had a history of difficult relationships with various different lawyers. And then eventually, very soon before trial, he asked to represent himself, a request that was initially granted. But the trial judge then realized that there was a substantial disruption associated with the request once Mr. Mitchell said he then needed four weeks, which the trial judge wasn't even sure would be enough time even then, given some of the complexities of the case. So again, I mean, whether the trial judge could have granted this request and delayed the trial, maybe, but was it objectively unreasonable for the California Court of Appeals to look at this and say this was not a violation of clearly established law? Well, I think it was objectively unreasonable on the facts in light of the evidence in the state court record under 2254 D2. And we have to distinguish in this context Mr. Mitchell's difficult relationship with trial counsel based on the emotions he brought to bear on the situation and his difficult relationship with trial counsel based on the very real considerations of wanting to limit his defense to complete innocence and not go down the road of lesser-included offenses like manslaughter, which in a case like this, in a context like this, well, who are they going to seize on as doing this? The jury is going to put the emotional hash together with, did he do it? It's going to totally undermine his case for complete innocence. Now we have... Okay, did you have a question? We can't hear you. Judge Bermute, are you muted? Test. Hello? Oh, there we go. Sorry, counsel. Is there something that prompted the Faretta request on June 10th? What exactly prompted it? Well, I think first the denial of the public defender on May 10th, which was... That's a full month before that. There was not a lot that happened in the interim, and I detail that chronology, which is very important and distinguishes this from the Marshall case. On May 25th, Mr. Hanlon went to court and he asked for money for a psychological expert, a psychiatric expert, and he said very explicitly, Mr. Mitchell, much different than what he said in January. Mr. Mitchell, yeah, he's going to testify that he didn't commit this crime and other people committed the crime, but I may not argue that. Whether I argue that, that's up to me. I may not argue that. That's May 25th, you're saying? That's May 25th. Okay, so that's 15 days before June 10th. And then after May 25th, the court went on the conclusion of the May 25th hearing. They coming up, and the next hearing is the June 10th hearing after Mr. Hanlon went on the record on May 25th saying, I don't even know if legally I'm allowed to put on a defense that undermines my client and contradicts him, but if you give me the money, I'm going to do it. And he didn't get the money right then. He got maybe $2,000. And then the judge goes on and I point out again, going back to the Wyndham case, Wyndham even says, the rationale underlying the Supreme Court's decision in Florida is not difficult to understand. But quite simply, the state may not constitutionally prevent a defendant charged with a commission of a criminal offense from controlling his own fate by forcing on him counsel who may present a case which is not consistent with the actual wishes of the defendant. So that's a very serious consideration. How it developed in this case is, I'd say, mathematically practically established in the record. And Mr. Mitchell acted as expeditiously, as humanly possible, in trying to vindicate his concerns, both first with asking for the preferred new assistance of counsel, and that way he didn't get that. And it was clear that Hanlon was going to betray him, insisting on his Faretta rights, which he should have been granted. Do you want to save your time? Thank you, Your Honor. I can submit the sentencing issue on the briefs and I'll reserve my time. Thank you. Thank you. Mr. Rose? Good afternoon, Your Honors. Can you hear me now? Yes, we can hear you. Thank you. Thank you, Your Honor. The court has made the two points that I would stress in my own argument. First, that this Faretta request was made on the eve of trial. There were jurors, a thousand jurors had been screened for hardship and for cause challenges. There were a hundred jurors in the courtroom waiting to be wardered. Witnesses were subpoenaed. The two elderly 80-year-old eyewitnesses were being held. This was two years in the making for this trial. So certainly under the Wyndham factors in California, and which are authorized by Marshall v. Taylor by this court's jurisprudence, the Court of Appeal made a reasonable decision on the facts. The other point is that Mr. LeBlanc seems to suggest that this was a sudden realization by the petitioner that his attorney was going to make the alternative arguments. In fact, this had been the same dialogue that Mr. Mitchell had been having with all of his attorneys. The two previous ones, Mr. Hallinan and Mr. Horngrave that he had fired, and Mr. Hanlon for months and months and months. And the Court of Appeal made a specific factual finding that in fact there had been ongoing discussions between Mr. Mitchell and Mr. Hanlon regarding this exact subject, that Mr. Hanlon hadn't even made a final decision as of the date of the Vreda motion. He didn't make a decision until weeks later about whether he was going to go ahead and argue the alternative round. So there was no precipitating event on the day before the trial was about to begin that caused Mr. Mitchell to understand anything different than his voluminous discussions with Mr. Hanlon through the months and months and months, which were the same discussions he'd been having with Mr. Hallinan and Mr. Horngrave all along, when all three of these extremely excellent attorneys were trying to convince him he didn't have a chance on an actual innocence defense. So nothing had changed at the eve of the trial. It was the eve of the trial. It was too late under Marshall v. Taylor. It was too late under the California Lindum factors. And as the Court, I think, has pointed out, there is no showing in any degree of an unreasonable finding by the California Court of Appeal on either of these points, deficient performance or prejudice. If the Court has any questions, I'd be happy to discuss further, but if not, I'd be prepared to submit. Well, counsel argues that it wasn't until May 20, well, it wasn't until after the May 25 hearing, sometime after, that Mitchell learned that his counsel was actually going to act against his wishes. And the next opportunity he had to assert his vereda rights was the June 10 hearing. How do you respond to that? There's nothing in the record to support that contention. The Court of Appeal has been in these conversations, been ongoing for months and months and months, in fact, for years, but with this particular attorney for months. And the attorney had stated later that he did not decide finally which way to go on this, because it's obviously a delicate matter emotionally and legally. He hadn't made a final decision until weeks after this vereda motion in the beginning of June. So there's absolutely nothing in the record to support a precipitating event on June 3rd. I had a question on the sentencing. Do you think it was reasonable to say that the performance of counsel was adequate when he didn't make any argument at all? At first blush, it perhaps seems questionable, but if you think about the situation, it's a bit bizarre for appellant to be complaining that counsel didn't make an argument because that's exactly what he requested. The only rational argument, in fact, appellant in his brief concedes that the only rational argument for concurrent sentences involved the facts of the case, conceding that appellant was guilty, but that his personal intent in the case was a single intent and it was a single course of behavior rather than two different behaviors. So in order to make a rational argument on those grounds, counsel would have had to concede that appellant was guilty, which is exactly what appellant has all along requested counsel not to do. So for him now to claim that he didn't make that argument is odd. Counsel did exactly what appellant requested him to do. The idea that he didn't stand by prepared to object to anything improper was counsel never said I'm going to absent myself. He just said I'm not making that argument. I can't make that argument. He told me not to make that argument and I can't make any other rational argument than that. Appellant in his brief concedes that's the only argument to have been made, so he didn't make it. He was there. The court of appeal found that if something untoward had happened, something improper had happened, Mr. Hammond was there and he was on the job. It wasn't a complete absence of deprivation of counsel. And then just briefly... Can we just pause on that point, though? I mean, there is a prejudice question, but why couldn't Hamlin, consistent with his views of the case, have still tried to make an argument on the concurrent sentencing point and said the kidnapping was really part and parcel of the murder and it should therefore be concurrent? I mean, was there something that would have caused him to get in trouble with his client if he had made that argument? Well, yes, Your Honor. That argument can't be made in the abstract. It wasn't a kidnapping is consistent with is a part and parcel of a murder. It was this kidnapping of this child, his child, was part and parcel of this murder, his murder of his wife. So Hamlin couldn't voice that argument without conceding that appellant had killed his wife and kidnapped his own child. Which is exactly what Mitchell forbade, attempted to forbid counsel from doing. So as I said, it's not an abstract argument. It did entail the exact concession that counsel was trying to avoid making. And then very briefly on prejudice, as I said, in his brief, counsel concedes that was the only trial he knew appellant backwards and forwards. He knew of his domestic violence. He knew of his history. He knew of his inheritance. He knew of everything about this. He knew the facts of the case. He'd been through, the judge had been through two years of the extremely talkative appellant in the courtroom. This judge knew everything about this case. There was nothing, any reasonable, and counsel has not proposed any reasonable argument that could have been made that the judge wasn't completely familiar with in this case. Did Mitchell make the argument that it be concurrent also during his? No, no, no. He just, he said it wasn't me. That's what he wanted all along. It was not, I had nothing to do with it. He argued it wasn't him at the sentencing? Yes. He absolutely refused to admit that he was guilty of murder. It was the two dealers that had beaten his wife to death. It was not him. He was absolutely innocent. That was what he was adamant about all along. Which was an argument that any rational person there at this trial knew had no colorable basis whatsoever. All right. Thank you, counsel. Thank you, your honor. Mr. Loveliner. Thank you, your honor. Briefly on the sentencing point, Mr. Mitchell wanted counsel at sentencing. Hanlon refused to be counsel at sentencing. He said, I'll be the body. He was the body. He was the sleeping lawyer. Mr. Mitchell was denied counsel at sentencing. Going back to the Ferretta argument, I don't understand the point about Hanlon not having made up his mind until jury instruction conference about what he was going to do. If that's a test by which when Mr. Mitchell had a ripened Ferretta right, then he certainly had it when he had doubts long before that. Just to conclude, if you look at the timeline, if you look at the considerations where Mr. Mitchell was given comfort in January and when the problems developed and the first chance that he could have asserted them after it was clear that he was going to be betrayed, it was June 10th. And the conclusions to the contrary that he forfeited his rights were unreasonable. All right. Thank you, counsel. Thank you, your honor. Thank you, your honor. I thank you both for an excellent argument. Mitchell versus Cochran and Davey is submitted.
judges: WARDLAW, BRESS, BUMATAY